UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
K.R., an infant by her Mother and Natural Guardian :
DARIA PEREZ,                                          :          FINDINGS OF FACT AND
                                                     :          CONCLUSIONS OF LAW
                                                     :
                          Plaintiff,                 :
                                                     :          08-CV-2192
          -against-                                  :          (Kuntz, J.)
                                                     :
THE UNITED STATES OF AMERICA,                        :
                                                     :
                                                     :
                          Defendant.                 :
-------------------------------------------------------------X

**KUNTZ, United States District Judge**

Plaintiff K.R. ("Plaintiff" or "K.R.") is a minor who brings this medical malpractice action against Defendant United States of America through her mother and natural guardian Daria Perez ("Ms. Perez") pursuant to the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* ("FTCA"). Plaintiff alleges she wrongfully was subjected to a visual vaginal inspection by employees of the Lutheran Medical Center School Health Program ("Lutheran Program") while attending Public School 10 ("P.S. 10") in Brooklyn, New York. Specifically, Plaintiff claims deemed employees of the United States, Patricia Silverman ("Nurse Silverman"), a licensed nurse practitioner, and Nancy Rodriguez ("Ms. Rodriguez"), a licensed medical assistant, departed from the applicable standard of medical care by conducting a visual vaginal inspection on January 13, 2006. Plaintiff argues the medical consent and enrollment form signed by her mother, Ms. Perez, did not provide Nurse Silverman and Ms. Rodriguez consent to perform the visual vaginal inspection.

This Court conducted a four-day bench trial in accordance with 28 U.S.C. § 2402 solely on the issue of liability. Having reviewed the testimony and exhibits, as well as the parties' post-trial submissions, this Court, pursuant to Rule 52 of the Federal Rules of Civil Procedure, makes the following Findings of Fact and Conclusions of Law. For the reasons set forth below, this Court finds the United States not liable for medical malpractice.

## I. Findings Of Fact

### A. Background

Plaintiff K.R. is a thirteen-year-old female born on June 13, 1998. At all times relevant to this action, K.R. was a seven-year-old student at P.S. 10 in Brooklyn, New York and was living in the home of her maternal grandparents with her mother and two brothers. Nurse Silverman and Ms. Rodriguez were employees of the Lutheran Program and provided medical care to K.R. on January 13, 2006.

Nurse Silverman has been a licensed adult and family nurse practitioner for approximately fifteen years. Tr. 472:11–20. She began working for the Lutheran Program in September 1997 as a family nurse practitioner. Tr. 479:21–23. She worked full-time at P.S. 10 from September 2005 to January 2009 and treated approximately twenty to twenty-five students per day. Tr. 480:19–481:3; 781:6–16. During her career in the Lutheran Program, Nurse Silverman conducted thousands of visual vaginal inspections. Tr. 758:9–13. She testified she most often conducted these inspections during routine well exams of female students. Otherwise, she performed them to check for trauma, injury, and foreign objects, or to investigate patient complaints about the vaginal area. Tr. 758:14–18. Nurse Silverman has conducted the majority of visual vaginal inspections in the presence of the parent(s) of the student. However, she has conducted at least thirty percent of these inspections without a parent or guardian

present. Tr. 758:21–759:9. Each time the parent had been absent, he or she was informed of the inspection afterward. Other than this case, no parent had ever complained about the inspection being conducted by Nurse Silverman outside of a parental presence. Tr. 780:16–781:5.

Ms. Rodriguez has been a licensed medical assistant for approximately eleven years. She has been employed by the Lutheran Program since 2002 as a floater medical assistant. Tr. 395:6–396:18. Ms. Rodriguez had observed multiple visual vaginal inspections where the parent was not present. Tr. 437:13–25.

### B. The Relevant Medical History Of Plaintiff Prior To January 13, 2006

The pediatrician of Plaintiff is Dr. Vasudev Gabbur. According to the medical records of Dr. Gabbur, K.R. has been a patient since at least July 5, 2005 when she was seen for a well exam. Ex. H. During a subsequent visit on August 20, 2005, K.R. complained of vaginal discharge. According to the medical records of Dr. Gabbur, Ms. Perez stated K.R. received a bubble bath with dishwashing liquid while at her grandmother's house the week before and had vaginal discharge for five days. Dr. Gabbur conducted a vaginal exam and diagnosed K.R. with vaginitis.

### C. The Enrollment Of Plaintiff In The Lutheran Program

The Lutheran Program is a federally funded healthcare program designed to offer primary medical care to participating students at school and at no cost to their parents. Tr. 482–484. The Lutheran Program utilizes nurse practitioners who can diagnose and treat illness and injury, as well as prescribe medication. Schools participating in the Lutheran Program agree to provide appropriate facilities, equipment, and supplies necessary to render the medical services. Enrollment of a student in the Lutheran Program is entirely optional.

The Lutheran Program operates a school-based clinic at P.S. 10 pursuant to a Memorandum of Understanding dated February 2001. Ex. D; Tr. 710:5–16. Parents voluntarily enroll their child in the Lutheran Program by completing and submitting a Medical Consent and Enrollment form ("General Consent Form"). Ex. A, Tr. 486–488. The General Consent Form provides two levels of care from which parents can choose to enroll their child. The first option offers "Complete Medical Care" and includes "complete physical examinations, immunizations, routine laboratory tests, treatment for both acute and chronic illnesses, psychological and nutritional counseling, dental, vision and hearing screening, health education and first aid." Ex. A. The Complete Medical Care option permits a nurse practitioner to conduct a complete physical examination of a child and provide treatment even when a child's parent is absent. Tr. 489:20–25. The second option offers "First Aid and Health Screening" and includes "only first aid treatment for minor bumps, bruises, cuts or minor complaints, and dental, vision, hearing screening. This level does not include physical examinants [sic] and treatment for illness." Ex. A. The First Aid and Health Screening option allows a medical assistant to render first aid, but it does not permit a nurse practitioner to treat and examine a child. Tr. 488:9–24. Therefore, a child requiring immediate medical attention or physical examination would not be able to receive it at the school-based clinic.

Parents wishing to enroll their child in the Lutheran Program select one of the two levels of care on the General Consent Form, sign the form, and indicate their relationship to the child. Parents must provide their home address and telephone, work telephone, and any insurance information. Ex. A; Tr. 486:16–24. In 2006, approximately ninety to ninety-five percent of P.S. 10 students were enrolled in the Lutheran Program. Of those students, approximately ninety percent of the parents selected the Complete Medical Care option. Tr. 397:16–18.

Ms. Perez enrolled K.R. in P.S. 10 on March 1, 2005. Tr. 142:22–25. On the same day, Ms. Perez enrolled K.R. in the Lutheran Program by signing and submitting a General Consent Form. Ex. A; Tr. 141:16–142:3. During the time K.R. attended P.S. 10, Ms. Perez submitted two separate General Consent Forms. The first was dated March 1, 2005 and submitted the day K.R. began school at P.S. 10. On that form, Ms. Perez selected the First Aid and Health Screening option. Ex. A. On October 26, 2005, K.R. presented to the Lutheran Program Clinic at P.S. 10 complaining of left ear pain but no fever. Her grandmother was notified and picked K.R. up from school. Ex. A. The next day, on October 27, 2005, Ms. Perez completed a new General Consent Form and selected the Complete Medical Care option. Ex. A; Tr. 139–140. By consenting to the Complete Medical Care option, Ms. Perez knew the nurse practitioner would be authorized to provide K.R. with complete medical care, treat acute illness, and conduct a physical examination even when she was not present. Tr. 137:15–17; 143:21–144:5. Ms. Perez did not limit her consent on the October 27, 2005 General Consent Form in any way. Ex. A.

### D. The Medical Treatment Of Plaintiff On January 13, 2006 At P.S. 10

On the morning of January 13, 2006, K.R. went to school as usual. At some point in the morning, she began to experience pain in her groin area. She alerted the classroom paraprofessional Minerva Villalobos ("Ms. Villalobos") of her pain and pointed to her private area. Tr. 189:15–24. Ms. Villalobos thought it was strange that a seven-year-old child would have pain in her groin area. 189:25–190:1–2. Ms. Villalobos testified K.R. appeared to be in pain and discomfort. Tr. 190:3–4. There are two nurse's offices located at P.S. 10—the Board of Education nurse's office and the Lutheran Program Clinic ("Lutheran Program Clinic"). Ms. Villalobos took K.R. to the Lutheran Program Clinic located on the second floor across from P.S.

10's main office. On the way to the Lutheran Program Clinic, K.R. told Ms. Villalobos "her private area hurt" and the pain was "traveling down both her legs." Tr. 190:21–24.

When Ms. Villalobos and K.R. arrived at the Lutheran Program Clinic, they first encountered Ms. Rodriguez, the medical assistant assigned to P.S. 10 on January 13, 2006. Ms. Villalobos told her K.R.'s "private part was hurting." Tr. 403:17–23. Ms. Rodriguez testified K.R. looked uncomfortable, and both of her hands were cupping her groin area. Tr. 403:24–404:2. Ms. Rodriguez asked K.R. if she had gotten hurt. K.R. said no. Tr. 404:10–14. Ms. Rodriguez got an ice pack and gave it to K.R. Tr. 403:22–404:19. At this time, Nurse Silverman was in her office seeing another child. Tr. 411:3–9.

Ms. Rodriguez retrieved K.R.'s chart and reviewed the General Consent Form contained therein to determine in which level of care K.R. was enrolled. It is routine practice for the practitioners in the Lutheran Program Clinic to put a red dot in the corner of the chart of a student enrolled in the Complete Medical Care option. Ms. Rodriguez saw K.R's chart had the red dot indicating K.R. was enrolled in the Complete Medical Care option and contained a signed General Consent Form with the box next to "Complete Medical Care" checked off. Tr. 404:24–405:20; 408:19–23. Believing Nurse Silverman had consent to treat K.R., Ms. Rodriguez informed Nurse Silverman that K.R. was crying, complaining of pain, and cupping her vagina. Tr. 410:22–411:9; 496:9–14. Nurse Silverman instructed Ms. Rodriguez to get a urine sample from K.R. and test the sample. Tr. 412:12–14.

Ms. Rodriguez asked K.R. to go into the bathroom and provide a urine sample. After K.R. was finished and left the bathroom, Ms. Rodriguez went into the bathroom and dipped the urine with a urine dipstick. Tr. 416:25–417:4. The urine dipstick test involves placing a strip containing several different indicator boxes into the urine sample to detect any abnormal

6

chemicals. Tr. 498:11–20. Ms. Rodriguez recorded the results on a Post-it note, and then personally informed Nurse Silverman of the results. Tr. 418:13–23, 499:6–14.

The results of the urine dipstick test indicated the presence of large leukocytes, trace blood, and trace protein. The test further indicated the urine sample had a pH level of 8.0 and a specific gravity of 1.000. There were no nitrites present. The presence of large leukocytes suggests inflammation, infection, or poor hygiene. Trace blood in the urine can occur from trauma to the genital area, a urinary tract infection, or a foreign body. A pH level of 8.0 indicates alkaline urine, which is suggestive of a urinary tract infection. Typically, the presence of leukocytes and trace blood, coupled with the presence of nitrites, is indicative of a urinary tract infection. Here, K.R.'s urine sample did not contain nitrites. Ex. A; Tr. 231:14–232:1, 501–502, 551–552.

Nurse Silverman reviewed the urine dipstick test results and directed Ms. Rodriguez to call K.R.'s mother, Ms. Perez. She then called K.R. into her office. Tr. 419:1–18. Ms. Rodriguez called the home number listed on the October 27, 2005 General Consent Form, and there was no answer. At some time prior to this point, Ms. Villalobos had procured K.R.'s emergency home contact form ("Blue Emergency Card") from the main office at P.S. 10. Ex. E; Tr. 192:13–18. The Blue Emergency Cards are maintained in the main office and contain emergency contact information as filled out by the parent. Ms. Perez filled out the Blue Emergency Card for K.R. It included home, work, and cell phone numbers for Ms. Perez. Additionally, it listed contact phone numbers for K.R.'s grandparents, godmother/aunt, and father. Ex. E. Ms. Rodriguez "started calling every number that [she] could find on the Blue Emergency Card," but "was not able to speak to anyone." Tr. 420:17–25. Whenever there was an opportunity, she left a voice message identifying herself as the medical assistant at P.S. 10

and indicating she was looking for Ms. Perez. She did not reach any person with whom she could speak when making these calls. Tr. 421:18–23. Ms. Rodriguez asked K.R. if she knew of any other phone numbers where her mother could be reached. K.R. said no. Tr. 422:15–16.

K.R. was in Nurse Silverman's office while Ms. Rodriguez was attempting to reach Ms. Perez. Nurse Silverman asked K.R. to climb onto the exam table and commenced her medical evaluation. Tr. 499:1–5. She asked K.R. what the problem was. K.R. pointed to her groin area and indicated it hurt. K.R. told Nurse Silverman that she experienced "pain upon urinating for '1 year or more'." She also said she had a deep vaginal rash in the past. Nurse Silverman asked K.R. if she had hurt herself, and K.R. said no. Nurse Silverman asked K.R. if anyone had touched her or done anything to her, and K.R. said no. K.R. described a medical history of having experienced stomach viruses and vomiting. K.R. also stated her arms were itchy. While K.R. described her condition and medical history, Nurse Silverman contemporaneously made notes in K.R.'s chart. Ex. A; Tr. 504.

Nurse Silverman asked K.R. to indicate her level of pain on the "Faces Pain Scale." The Faces Pain Scale is a picture-based system commonly utilized in pediatrics to illustrate the level of pain a child is experiencing. Here, the Faces Pain Scale ranges from zero to five. Each number corresponds to a different face. The number zero corresponds to a smiley face and the number five corresponds to a crying face. Tr. 557:2–15; 731:13–19. When presented with the Faces Pain Scale, K.R. selected a pain level of 3–4. Ex. A. This selection translates to a 6–8 level of pain on a standard adult pain scale where ten denotes the highest level of pain. Tr. 558:12–559:5.

Nurse Silverman observed K.R. was crying and uncomfortable, so she attempted to call her mother at the home number listed on the October 27, 2005 General Consent Form. Nurse

Silverman testified no one answered the home telephone. She left a message stating she was calling from P.S. 10 and K.R. was in the nurse's office. Tr. 522:20–524:2; 717:20–718:5.

Next, Nurse Silverman conducted a physical external examination of K.R. Nurse Silverman observed K.R. was well-nourished, well-developed, and alert. She noted K.R was in no acute distress, meaning K.R. was not in any physical acute distress or life-threatening circumstance. Nurse Silverman examined K.R.'s ears with an otoscope and found them to be within normal limits. She checked K.R.'s nose with the same otoscope and observed her nostrils were mildly injected, meaning they were redder than normal. She looked inside K.R.'s mouth and throat. Nurse Silverman observed K.R. had bad breath and enlarged tonsils, both suggestive of a possible throat infection. She decided to test for a throat infection. She used a long Q-tip to swab K.R.'s tonsils while using a tongue depressor to hold down the tongue. Nurse Silverman then placed the Q-tip in a solution and used a testing strip to determine whether K.R. had a strep throat infection. The test indicated K.R. did not. Ex. A; Tr. 505–508.

Nurse Silverman also externally checked K.R.'s throat and neck. Both were normal. There was no swelling of the glands and the neck was supple, indicating an unlikelihood of meningitis. Nurse Silverman examined K.R.'s lungs and heartbeat using a stethoscope. Her lungs were clear, and she had a regular heart rate and rhythm. Nurse Silverman examined K.R.'s abdomen, which was normal. There was no suprapubic tenderness. Ex. A; Tr. 509–511; 553:12–554:25.

After completing the physical exam, Nurse Silverman asked K.R. to sit in a chair in her office. She observed K.R. was still in pain and crying. Sitting in a chair caused apparent discomfort to K.R., and she was still holding her groin. Tr. 718:6–14. Nurse Silverman again tried to contact Ms. Perez. This time, she had the additional numbers from the Blue Emergency

Card. She called the cell and work phone numbers of Ms. Perez listed on the card. When Nurse Silverman called the cell phone number, she received a message that the number no longer existed. She made approximately five attempts to contact the employer of Ms. Perez and kept getting busy signals.

Approximately forty-five minutes had elapsed during which Nurse Silverman was unable to reach Ms. Perez. Tr. 734:14–25. She was concerned about the ongoing pain K.R. described and the inconclusive results of the urine dipstick test and physical examination. Nurse Silverman testified the possible causes of the pain included injury or trauma to the genital area, an infection such as a urinary tract infection, the presence of a foreign object in or near the genital area, or possible child abuse. Tr. 742:8–744:24. Nurse Silverman decided she would conduct a visual vaginal inspection to determine the cause of pain in K.R.'s groin area. She told K.R. she was unable to reach her mother and would have to check her groin area. K.R. indicated she understood and climbed back onto the exam table. Tr. 741:2–10. Because a visual vaginal inspection is a sensitive exam, Nurse Silverman asked Ms. Rodriguez to step inside her office so another adult witness was present in the room. Tr. 423:10–22; 747:1–6. She re-introduced Ms. Rodriguez as the medical assistant to K.R. Tr. 429:5–7.

Nurse Silverman drew the privacy curtain which separates the exam table from the entrance door to her office. Ex. T; Tr. 429:16–20. She asked K.R. to pull down her pants and underwear. K.R. complied with these instructions and pulled down her pants and underwear to her knees. She laid back on the exam table. Tr. 429:16–430:4; 747:7–17. Nurse Silverman asked K.R. to spread her knees apart, and she did so. Nurse Silverman then used her gloved left hand to gently separate the labia majora, which were slightly stuck together, so she could see K.R.'s vaginal orifice. Tr. 751–52. Nurse Silverman did not observe any injury, trauma,

swelling, inflammation, redness, tears, or foreign objects. Tr. 753:1–6. When Nurse Silverman told K.R. the inspection was done, K.R. said she needed to "look deeper" and her "mother looks deeper." Tr. 753:7–11. Nurse Silverman said she did not need to look deeper and the exam was complete. K.R. stood up and pulled up her pants and underwear. Tr. 754:1–5. Nurse Silverman testified K.R. appeared calm and was no longer complaining of pain following the inspection. Tr. 754:9–16. Nurse Silverman sent K.R. back to class. Tr. 759:10–14.

K.R. testified Nurse Silverman never put anything inside of her private area and did not probe her genital area. Tr. 48:13–18; 162:6–13. Other than using her gloved hand to separate the labia majora, Nurse Silverman testified she did not physically touch K.R. during the visual vaginal inspection. Tr. 754:17–20. Ms. Rodriguez testified Nurse Silverman did not use a Q-tip or tongue depressor during the visual vaginal inspection. Tr. 440:10–13. Ms. Rodriguez stood approximately three feet from the exam table while Nurse Silverman conducted the visual vaginal inspection. Ex. T; Tr. 428:5–18. She testified the entire inspection took a few seconds. Tr. 430:21–25. After K.R. pulled up her pants and underwear, Ms. Rodriguez left Nurse Silverman's office. Tr. 431:1–5.

After K.R. left the Lutheran Program Clinic, Nurse Silverman continued to attempt to contact Ms. Perez. Tr. 720:11–15. She finally got through to the previous employer of Ms. Perez. Nurse Silverman left a message with the receptionist, who provided another cell phone number for Ms. Perez. Tr. 718:16–722:6. After comparing the cell phone number listed on the Blue Emergency Card with the cell phone number provided by the previous employer, Nurse Silverman determined that the number originally provided by Ms. Perez contained one incorrect digit. Nurse Silverman corrected the cell phone number on the Blue Emergency Card and added it to the October 27, 2005 General Consent Form. Ex. A; Ex. E; Tr. 722:7–724:1. She called the

correct cell phone number and left a message at 11:13 a.m. stating: "Hi, this is the school nurse from P.S. 10. I just need to speak to the mother of [K.R.]. I just need to talk to her. She doesn't need to come up to school. I need you to call me back, please. My number is [ ]. Thank you." Tr. 77–78; 724:5–11. Nurse Silverman did not call the other numbers listed on the Blue Emergency Card for K.R.'s grandparents, godmother/aunt, and father. Tr. 724:23–725:10. She called K.R.'s classroom and asked her teacher if there were any additional phone numbers at which she could reach Ms. Perez. The teacher did not provide any additional contact phone numbers for Ms. Perez. Tr. 729:6–11.

### E. Interactions Between Ms. Perez And Lutheran Program Employees

Ms. Perez was in Prospect Park with her son, then-three-years-old, on the morning of January 13, 2006. Tr. 70:12–16. She received a phone call from her mother, who told her the nurse at P.S. 10 had left a message on her answering machine stating K.R. had a situation at school. Ms. Perez also received a message from the receptionist of her previous employer, who stated the nurse at P.S. 10 was trying to contact her. Tr. 78:25–79:9. Ms. Perez brought her son home and listened to the message left by Nurse Silverman. Tr. 79:10–17. Ms. Perez called P.S. 10 and spoke with Nurse Silverman, who stated K.R. had come to the Lutheran Program Clinic with pain in her groin area. Tr. 771:25–772:19. Ms. Perez testified Nurse Silverman told her she had performed certain tests on K.R. and looked at her vagina. Tr. 79:18–81:19. Ms. Perez became upset and decided to go to P.S. 10. She arrived at P.S. 10 around 12:00 p.m. and was directed to the Lutheran Program Clinic. Ex. X; Tr. 82:10–19.

When Ms. Perez arrived at the Lutheran Program Clinic, Nurse Silverman explained that K.R. presented with pain in her groin area and indicated a level 3–4 pain on the Faces Pain Scale. She referred to K.R.'s chart while discussing the physical exam she undertook and the results of

the urine dipstick test. Ms. Perez testified Nurse Silverman also referred to the Nixmary Brown case.[1] Tr. 84:11–25. Ms. Perez was upset Nurse Silverman had looked at her daughter's vagina outside of her presence. Tr. 84:6–25; 774:18–23. To address the concerns of Ms. Perez, Nurse Silverman wrote an addendum on the General Consent Form to "please call mom before seeing child" while Mr. Perez was present. Ex. A; Tr. 776:1–9.

Additionally, Nurse Silverman believed K.R. required continued care and asked Ms. Perez to take K.R. to see her physician. Nurse Silverman completed a Form 12-S and gave it to Ms. Perez. A Form 12-S is a Department of Education referral form that advises a student's physician to follow up on a particular medical issue and communicate his or her findings to the school. Ex. A; Tr. 765:14–18. Here, the Form 12-S was to be filled out by K.R.'s pediatrician, Dr. Gabbur, and returned to P.S. 10.

Ms. Perez then asked where her daughter was, and Nurse Silverman stated she was sent back to her classroom. Tr. 87:20–21. Ms. Perez found K.R. in the P.S. 10 cafeteria. They left the school and went home at approximately 12:45 p.m. Tr. 97:14–15.

That evening, Ms. Perez took K.R. to see Dr. Gabbur at approximately 5:30 p.m. Tr. 98:10–13. Ms. Perez told Dr. Gabbur the school nurse had inspected K.R.'s vagina. Tr. 98:20–25. Dr. Gabbur wrote in his medical records that K.R. presented with burning on urination since the morning. Dr. Gabbur conducted a physical examination and a visual vaginal inspection of K.R. He diagnosed K.R. with a urinary tract infection. He did not note any other observations or problems in his medical records. Ex. H; Tr. 100:16–17.

---

[1] Nixmary Brown, a seven-year-old child from Brooklyn, was found beaten to death by her stepfather on January 11, 2006 (two days before K.R. was examined by Nurse Silverman and Ms. Rodriguez). Following this incident, the Office of Bill de Blasio, public advocate for the City of New York, conducted a review of 75 child fatality reports between January and December 2011. Their findings indicate fatalities often occur following multiple reports of abuse or neglect, where the mothers have a history of engagement with the child welfare system themselves as children, where the child is subject to unsafe sleeping arrangements, and where the child lives in poor housing conditions. *Office of the Public Advocate, Lessons from Tragedy: A Review of Child Fatalities in New York City* (January 2012), *available at* http://advocate.nyc.gov/sites/advocate.nyc.gov/files/DeBlasioChildFatalitiesReport.pdf.

Notably, on a subsequent visit to Dr. Gabbur on September 27, 2007, K.R. again complained of pain on urination. The medical records of Dr. Gabbur indicate K.R. had experienced vaginal discharge on and off for one year and her mother denied any sexual abuse. During this visit, Dr. Gabbur again conducted a visual vaginal inspection of K.R. Ex. H.

### F. Inconsistent Testimony About The Events At Issue

The Court has identified three key areas of inconsistent testimony about the events of January 13, 2006. For the reasons stated below, the Court finds (1) K.R. complained of pain in the groin area to Ms. Villalobos, Ms. Rodriguez, and Nurse Silverman on the morning of January 13, 2006; (2) K.R. assented to the visual vaginal inspection by Nurse Silverman; and (3) the visual vaginal inspection conducted by Nurse Silverman did not involve the use of any instruments to penetrate or otherwise probe K.R.'s genitalia.

#### 1. K.R. Complained Of Pain In the Groin Area

At trial, K.R. testified the location of her pain was in her right side and traveling down her leg, and not in her groin area. Tr. 15:3–12; 31:5–11. The Court does not find the testimony of K.R. as to the location of her pain to be credible. Notably, Plaintiff's counsel made a judicial admission during his summation that K.R.'s recollection of the events was inaccurate and should not be credited in its entirety. Tr. 841:18–19; 883:9–12. First, K.R.'s trial testimony is inconsistent with her prior testimony. K.R. testified in May 2006 she had groin pain, and not leg pain. Tr. 59–60. Second, the testimony of K.R. is inconsistent with the testimony of three adult witnesses who observed and treated K.R. on January 13, 2006. Ms. Villalobos testified K.R. was complaining "her private part hurt." Tr. 190:21–24. Ms. Rodriguez testified Ms. Villalobos told her K.R.'s "private area was hurting" and directly observed K.R. cupping her groin area. Tr. 403:22–404:7. Nurse Silverman testified K.R. complained of pain in her groin area. Tr. 504:5–

10. Furthermore, K.R.'s complaint of pain in her groin area is consistent with the medical records of Nurse Silverman and Dr. Gabbur, which explicitly state K.R. was experiencing pain upon urination. Ex. A; Ex. H. In fact, K.R. testified at trial she complained of pain in her genital area to Dr. Gabbur on January 13, 2006. Tr. 56:1–4.

### 2. K.R. Assented To The Visual Vaginal Inspection

K.R. claims she did not assent to the visual vaginal inspection and physically resisted Nurse Silverman's inspection by "thrashing around," kicking her legs, and yelling for Nurse Silverman to stop. K.R. testified Ms. Rodriguez forcibly pushed her hands down and Nurse Silverman pulled down her pants and underwear against her will. After Nurse Silverman successfully spread K.R.'s legs open, she looked inside at K.R.'s genitals. K.R. further alleges Nurse Silverman used a tongue depressor and/or Q-tip and lightly ran it around her genital area. Tr. 21:21–26:12.

The testimony of K.R. at trial is inconsistent with her previous testimony in this action as well as the testimony of Nurse Silverman and Ms. Rodriguez. On cross-examination, K.R. testified Nurse Silverman asked her to pull down her pants and underwear and she cooperated. Tr. 44:3–13, 17–19. Nurse Silverman and Ms. Rodriguez testified K.R. was calm and cooperative throughout her visit to the Lutheran Program Clinic. Nurse Silverman asked K.R. questions about her medical history, and K.R. cooperated by answering the questions. Nurse Silverman conducted a thorough physical examination of K.R. and took contemporaneous notes to document her findings. Nurse Silverman testified K.R. even conversed with her during the visual vaginal inspection by telling her to "look deeper." Ex. A; Tr. 753:7–16.

Additionally, if K.R. was resisting the inspection in the manner she described, it would not have been physically possible for Nurse Silverman to carry out the inspection. There is a

mere twelve-inch space between the edge of the exam table where K.R. was lying down and a filing cabinet. Ex. T; Tr. 428:2–4; 752:12–14. If K.R. was kicking her legs and thrashing around, Nurse Silverman would have not been able to physically restrain her while simultaneously conducting the visual vaginal inspection. Tr. 604:12–605:22. It is simply implausible that Nurse Silverman could have used her hands to hold down K.R.'s legs and concurrently used her gloved hand to separate the labia majora and hold a Q-tip or tongue depressor to inspect K.R.'s genitalia. Additionally, Ms. Villalobos testified she never saw or heard K.R. yelling or screaming while in the Lutheran Program Clinic. Tr. 195:19–25. In fact, there is no evidence of any raucous or yelling coming for the Lutheran Program Clinic, which is located directly opposite the P.S 10 main office, on the morning of January 13, 2006.

Ms. Perez also claims Nurse Silverman and Ms. Rodriguez forcibly held down K.R. and caused K.R. to develop "physical redness and welts" that took two days to heal. Tr. 175:18–23; 176:15–22. This observation is not consistent with the reports of K.R.'s pediatrician, Dr. Gabbur, who saw K.R. on the evening of January 13, 2006. Dr. Gabbur is a "mandated reporter" who is obligated by law to report suspicious injuries to the appropriate child protection authorities. In an October 2009 deposition, Dr. Gabbur testified he would have noted any other complaints in the medical records. Ex. H. However, Dr. Gabbur did not note any marks or welts on K.R.'s wrists, or any abnormalities of the extremities. Ex. H. Therefore, the medical records of Dr. Gabbur do not support the version of events purported by either K.R. or Ms. Perez. His medical records specifically state K.R.'s chief complaint was pain upon urination. Tr. 598:14–24.

### 3. Nurse Silverman Did Not Conduct A Gynecological Examination Of K.R.

Ms. Perez alleges Nurse Silverman probed K.R. with instruments and conducted a gynecological exam of K.R. Ms. Perez was not present at any point during K.R.'s visit to the Lutheran Program Clinic on January 13, 2006. At trial, she admitted to using the terms "sexually molested," "rape," and "probed" when discussing the incident in front of her daughter. She told K.R. Nurse Silverman might have given her a disease or broken her hymen. Tr. 173:17–174:12. However, K.R. herself testified Nurse Silverman never inserted a tongue depressor, Q-tip, or any other tool inside of her vagina or probed her genital area. Tr. 48:13–18; 162:6–13. When confronted with the testimony of her daughter, Ms. Perez admitted no gynecological exam took place on January 13, 2006. Tr. 163:6–16. Furthermore, it is undisputed by both experts that the visual vaginal inspection conducted by Nurse Silverman was a medically non-invasive procedure. Tr. 317:12–18; 565:6–17. The Court does not find the testimony of Ms. Perez to be credible as to the nature of the visual vaginal inspection conducted by Nurse Silverman. The testimony of Ms. Perez is not based on any direct observation and conflicts with the testimony of the three eyewitnesses who directly observed K.R.'s behavior, as well as the testimony K.R. herself. Furthermore, the testimony of Ms. Perez is inconsistent with the medical records of Nurse Silverman and Dr. Gabbur. Ex. A; Ex. H.

## II. Conclusions Of Law

### A. Federal Tort Claims Act And Applicable State Law

Under the FTCA, the United States is liable in the same manner as a private person for the tortious acts or omissions of employees acting within the scope of their employment "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Accordingly, a "federal court presiding over a FTCA claim must apply 'the whole

law of the State where the act or omission occurred.'" *Testaverde v. United States*, No. 05-cv-2642, 2009 WL 1456533, at *6 (Ross, J.) (E.D.N.Y. May 26, 2009) (quoting *Richards v. United States*, 369 U.S. 1, 11 (1962)). Here, because the alleged injury to Plaintiff occurred in New York, New York law applies.

The United States certified that Nurse Silverman and Ms. Rodriguez were acting within the scope of their deemed federal employment at the time of the incident out of which this claim arose. *See* ECF Docket Entry 8. Therefore, the United States is automatically substituted as the party defendant for Nurse Silverman and Ms. Rodriguez in their individual capacities. 28 U.S.C. § 2679(d)(1).

### B. Lack Of Informed Consent

K.R. claims the January 13, 2006 visual vaginal inspection was performed without the consent of her mother, Ms. Perez. Under New York law, a parent or guardian provides effective consent where the care of a minor is at issue. N.Y. Pub. Health Law § 2504(1–2). "[T]he consent of no other person shall be necessary." *Id.* A lack of informed consent claim arises when a procedure is performed with consent, but the consent is alleged to be based on insufficient information. A plaintiff must prove: (1) the medical provider failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks and benefits associated with the treatment that a reasonable medical provider would have disclosed under similar circumstances; (2) a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed; and (3) the lack of informed consent is a proximate cause of the injury. N.Y. Pub. Health Law § 2805-d(1), (3); *see Gotlin v. Lederman*, 616 F. Supp. 2d 376, 396 (E.D.N.Y. 2009) (Glasser, J.). Under New York law, a

plaintiff making this claim must "adduce medical expert testimony in support of the alleged qualitative insufficiency of the consent." N.Y. C.P.L.R. § 4401-a.

Both parties presented expert testimony regarding consent and the appropriate standard of care as to the treatment of K.R. Plaintiff presented the testimony of Alexandra Schneider, a family nurse practitioner licensed to practice medicine in New York. Tr. 214:19-23. The United States offered the testimony of Dr. Jessica Foltin, a pediatrician licensed to practice medicine in New York and New Jersey. Tr. 529:6–11.

### C. Medical Malpractice

Plaintiff further claims the visual vaginal inspection was performed in a manner that departed from the generally accepted standard of care in that it was (1) unwarranted and (2) inappropriately performed. To establish a claim of medical malpractice, a plaintiff must prove by a preponderance of the evidence: "(1) the standard of care in the locality where the treatment occurred, (2) that the defendants breached that standard of care, and (3) that the breach of the standard was the proximate cause of injury." *See, e.g., Berger v. Becker,* 272 A.D.2d 565, 565, 709 N.Y.S.2d 418 (2d Dep't 2000); *Matthews v. Malkus,* 377 F. Supp. 2d 350, 356 (S.D.N.Y. 2005) (McMahon, J.). Under the first element, the general standard of care for physicians in New York is well established and requires a physician to "exercise that reasonable degree of learning and skill that is ordinarily possessed by physicians . . . in the locality where he practices . . . . The law holds [the physician] liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment." *United States v. Perez,* 85 F. Supp. 2d 220, 226 (S.D.N.Y. 1999) (Scheindlin, J.) (quoting *Pike v. Honsinger,* 155 N.Y. 201, 49 N.E. 760 (N.Y. 1898)), *aff'd* 8 F. App'x. 48 (2d Cir. 2001); *see also Sitts v. United States,* 811 F.2d 736, 739–40 (2d Cir. 1987).

In addition, each element must be established by expert medical opinion unless the deviation from a proper standard of care is so obvious as to be within the understanding of an ordinary layperson. *Perez*, 86 F. Supp. 2d at 226. "[E]xcept as to matters within the ordinary experience and knowledge of laymen, in a medical malpractice action, expert medical opinion evidence is required to demonstrate merit." *Fiore v. Galang*, 64 N.Y.2d 999, 1000–01, 489 N.Y.S.2d 47, 478 N.E.2d 188 (1985).

## D. Analysis

### 1. Ms. Perez Knowingly Provided Informed Written Consent For The Visual Vaginal Inspection Of K.R.

It is undisputed that Ms. Perez signed and submitted the October 27, 2005 General Consent Form and selected the Complete Medical Care option. Ex. A; Tr. 137:2–23. Ms. Perez read the General Consent Form in its entirety before signing it. Tr. 137:2–6. She understood the Complete Medical Care option would permit the nurse practitioner at the Lutheran Program Clinic to conduct, *inter alia*, a complete physical examination and render treatment for acute and chronic illnesses even when she was absent. Tr. 137:15–17; 143:21–144:5. Ms. Perez agreed a potential illness could affect her daughter's genitalia. Tr. 144:6–8. In fact, she was aware of the possibility that her daughter may require treatment for vaginal-related problems and that such treatment may include a visual vaginal inspection. When Ms. Perez signed the October 27, 2005 General Consent Form, K.R. had previously suffered from vaginitis in August 2005 and underwent a visual vaginal inspection in connection with that illness. Ex. H; Tr. 144:9–11.

Ms. Perez initially limited her consent to the First Aid and Health Screening option on the March 1, 2005 General Consent Form. After K.R. was sent home on October 26, 2005 upon complaining of left ear pain, Ms. Perez submitted a new General Consent Form the next day and thereby enrolled K.R. in the Complete Medical Care option. She did not limit her consent on this

form in any way. Ex. A. Ms. Perez knowingly made the decision to permit a nurse practitioner to treat K.R. in the school setting and outside of her presence. Tr. 137:2–23. The contention of Ms. Perez that the written October 27, 2005 General Consent Form did not authorize Nurse Silverman to perform the visual vaginal inspection in spite of the plain language "[i]ncludes complete physical examinations" is without merit. Ex. A.

The expert testimony further supports this Court's finding that the October 27, 2005 General Consent Form authorized Nurse Silverman to perform the visual vaginal inspection of K.R. The testimony of Defendant's expert, Dr. Foltin, establishes it was reasonable for Ms. Perez to expect that the General Consent Form permitted a visual vaginal examination given K.R. previously had experienced vaginitis. Tr. 591:2–13. Dr. Foltin has experience and familiarity with General Consent Forms such as the one at issue in this case based on her work at a sleep-away camp for children. Tr. 545:15–546:4. Dr. Foltin opined a complete physical examination includes the genitalia when the child presents with pain in the groin area. Tr. 585: 7–20. The testimony of Dr. Foltin establishes the selection of the Complete Medical Care option on the General Consent Form provides consent for a visual vaginal inspection in the absence of the parent. Tr. 545–546; 598:5–16. In fact, Dr. Foltin has performed such visual vaginal inspections of children in the absence of a parent and pursuant to a written General Consent Form. Tr. 597:18–598:16.

Finally, Plaintiff has not established a reasonably prudent person would not have agreed to the visual vaginal inspection of his or her child under similar circumstances. Nurse Silverman and Ms. Rodriguez explained approximately ninety to ninety-five percent of P.S. 10 students were enrolled in the Lutheran Program in 2006. Of those students, approximately ninety percent of parents selected the Complete Medical Care option. Tr. 397:16–18. Nurse Silverman has

conducted thousands of visual vaginal inspections while working for the Lutheran Program. Tr. 758:9–13. She conducted at least thirty percent of these inspections without a parent or guardian present. Tr. 758:21–759:9. Other than this case, no parent had ever complained about such an inspection being conducted outside of his or her presence. Tr. 780:16–781:5.

Based on this evidence, this Court finds that the visual vaginal inspection of K.R. was performed with the consent of her mother, pursuant to the signed October 27, 2005 General Consent Form authorizing Complete Medical Care. Ms. Perez enrolled her daughter in the Complete Medical Care option knowing that K.R. may experience vaginal problems given her medical history of vaginitis, and treatment for such a complaint may require a visual vaginal inspection. Plaintiff has not met her burden of establishing a reasonably prudent person would decline the medical treatment at issue. Furthermore, the testimony of Nurse Silverman, Ms. Rodriguez, and Dr. Foltin demonstrate the frequency and permissibility of visual vaginal inspections even when the parent is absent.

### 2. The Decision Of Nurse Silverman To Conduct The Visual Vaginal Inspection Conforms To The Generally Accepted Standard Of Care

Nurse Silverman decided to perform the visual vaginal inspection of K.R. based on her professional judgment and the totality of circumstances presented by K.R.'s visit to the Lutheran Program Clinic on January 13, 2006. K.R. complained of ongoing pain in her groin area and identified the pain she was experiencing as a level 3–4 on the Faces Pain Scale. K.R. was cupping her groin area and appeared visibly uncomfortable. The urine dipstick test and physical examination were both inconclusive as to the cause of K.R.'s pain. In light of these factors, Nurse Silverman's decision to perform the visual vaginal inspection conformed to the generally accepted standard of care. Furthermore, it is undisputed that Nurse Silverman was qualified to perform a visual vaginal inspection. Tr. 346:16–18.

Assuming proper consent for a visual vaginal inspection, both experts agree each of the following factors individually justify a visual vaginal inspection: pain in the vaginal area, presence of blood in the urine (hematuria), pain upon urination (dysuria), and a suspicion of child abuse. Each of these factors is present in this case and individually warrants the performance of a visual vaginal inspection.

First, both experts testified when a child is complaining of pain in the groin area, it is within the professional discretion of a clinician to determine whether to perform a visual vaginal inspection based on the totality of circumstances. Tr. 237:1–14; 346:12–15; 572:7–14; 577–78. In fact, Dr. Foltin testified Nurse Silverman was obliged to perform the inspection given K.R.'s complaints of ongoing pain in the groin area. Tr. 579:14–25.

Second, the urine dipstick test indicated the presence of blood in the urine, or hematuria. Ex. A. Both experts agree it is within the professional discretion of a clinician to determine whether to perform a visual vaginal inspection when a child has hematuria. Tr. 344:8–11; 580:7–11. Dr. Foltin testified hematuria mandates a visual vaginal inspection. Tr. 580:7–11.

Third, K.R. presented with pain upon urination, or dysuria, on January 13, 2006. Ex. A. Later that day, Dr. Gabbur also wrote in his medical records that K.R. complained of burning on urination since the morning. Ex. H. The experts agree when a child has dysuria, the standard medical practice is to perform a visual vaginal inspection, and it is in the professional judgment of a clinician to do so. Dr. Foltin testified dysuria mandates a visual vaginal inspection. Tr. 580:17–22.

Finally, the experts agree it is within the professional discretion of a clinician to perform a visual vaginal inspection when he or she suspects child abuse. The testimony of Dr. Foltin establishes a complaint of pain in the groin area provides a reasonable basis to suspect abuse. Tr.

580:23–581:8; 584:8–17; 667:15–24. Additionally, the presence of blood in the urine can indicate sexual abuse. Tr. 552:6–11. Both experts agree consent of a parent or guardian is not required when a clinician suspects child abuse. Tr. 371:16–19; 584:18–25.

Plaintiff argues Nurse Silverman departed from accepted medical practice because the visual vaginal inspection was not done out of medical necessity, but due to an inappropriate and unwarranted concern of sexual abuse. The expert testimony establishes the standard of care allows a nurse practitioner to use her professional judgment to consider the totality of circumstances and determine whether a visual vaginal inspection is necessary. The Court finds Nurse Silverman did not breach the standard of care by deciding to conduct a visual vaginal inspection because Plaintiff's complaint of pain in the groin area and pain upon urination, the inconclusive urine dipstick results, the presence of blood in the urine sample, and a reasonable suspicion of child abuse would each independently justify a visual vaginal inspection.

### 3. The Visual Vaginal Inspection Performed By Nurse Silverman Conforms To The Generally Accepted Standard Of Care

After deciding to conduct a visual vaginal inspection, Nurse Silverman called Ms. Rodriguez into her office so another adult witness was present during the inspection. Tr. 747:1–6. She drew the privacy curtain and made certain the door to her office was closed before proceeding. Tr. 748:3–14. Nurse Silverman asked K.R. to pull down her pants and underwear, and K.R. assented. Tr. 747:7–17. She asked K.R. to spread her knees apart, and K.R. assented. Tr. 751:8–12. Nurse Silverman then used a gloved hand to spread the labia majora and check the vaginal orifice. Tr. 751:8–12. The evidence shows K.R. was cooperative with Nurse Silverman during the inspection. Tr. 747:7–17; 751:8–12; 753:7–11.

Nurse Silverman and Ms. Rodriguez made diligent efforts to contact Ms. Perez prior to conducting the visual vaginal inspection by calling multiple contact numbers and leaving

messages wherever there was an opportunity. Tr. 420–21; 725–26. While the experts and Nurse Silverman agree it was preferable for Ms. Perez to have been present during the inspection, they also agree the presence of Ms. Perez was not necessary. Tr. 375:22–24; 598:17–21.

The testimony of Dr. Foltin establishes the visual vaginal inspection conformed to the applicable standard of care. Tr. 570:24–571:25. Both experts agree the proper way to conduct a visual vaginal inspection is to spread the labia with a gloved hand and check the vaginal orifice. Tr. 321:19–23; 571:21–25. The experts also agree while it is preferable for the parent or guardian to be present during such an inspection, the presence of the parent or guardian is not required. Tr. 375:22–24; 598:15–599:11. Based on the evidence presented and the expert testimony, the Court finds Nurse Silverman conducted the visual vaginal inspection of K.R. in a manner that meets the generally accepted standard of care.

## III. Conclusion

Based upon the preceding Findings of Fact and Conclusions of Law, this United States District Court finds the United States not liable of medical malpractice. The Clerk of the Court is directed to enter judgment in favor of Defendant.

## **SO ORDERED**

Dated: Brooklyn, New York
February 16, 2012

s/WFK

HON. WILLIAM F. KUNTZ, II
United States District Judge